UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTNEL ORISCA,<br><br>Defendant | Criminal No. 24cr10378<br><br>Violations:<br><br>Counts One-Five: Wire Fraud; Aiding and Abetting<br>(18 U.S.C. §§ 1343 and 2)<br><br>Count Six: False Statements to a Financial Institution; Aiding and Abetting<br>(18 U.S.C. §§ 1014 and 2)<br><br>Wire Fraud Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461)<br><br>False Statement Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(2)(A)) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

*A. Relevant Individuals and Entities*

1. The defendant, CHRISTNEL ORISCA ("ORISCA"), was a resident of Boston, Massachusetts. ORISCA is presently a corrections officer with the Suffolk County Sheriff's Department, who was hired in late 2021.

2. The "Security Company" was a company based in Connecticut that provided campus security services to various higher education institutions in Massachusetts and other locations in the Northeast. ORISCA worked as a full-time employee of the Security Company from approximately March 2019 to October 2020.

3. The "Delivery Company" was a company based in Connecticut that provided package delivery services in Massachusetts and elsewhere through a subcontract with a national parcel delivery company. ORISCA worked as a full-time employee of the Delivery Company from approximately December 2020 to early December 2021.

4. The Massachusetts Division of Unemployment Assistance ("DUA") was a state agency located in Boston, Massachusetts that administers unemployment benefits programs in the Commonwealth of Massachusetts.

5. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

6. Cross River Bank ("CrossRiver"), was a federally insured financial institution based in New Jersey. CrossRiver participated as a lender in a program referred to as the Paycheck Protection Program ("PPP") operated by the SBA and, thus, was authorized to lend funds to eligible borrowers under the terms of the PPP. CrossRiver accepted and processed PPP loan applications through a loan referral agent called Bluevine Capital Inc. ("Bluevine"), a financial services company headquartered in California.

*B. Massachusetts Unemployment Insurance; Pandemic Unemployment Assistance*

7.  In the Commonwealth of Massachusetts, unemployment insurance ("UI") benefits are funded by the UI Trust Fund, which is comprised of federal funds, as well as monies obtained by state-imposed taxes on employers. DUA is responsible for administering the UI program in Massachusetts.

8.  The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. The CARES Act created a new temporary federal unemployment insurance program called pandemic unemployment assistance ("PUA"). PUA provided unemployment benefits for individuals who were not eligible for UI or other types of unemployment (*e.g.*, individuals who were self-employed, independent contractors, gig economy workers). All COVID-19 UI claims, and PUA claims, were eligible to receive additional monies and additional benefit weeks from temporary federal programs created by the CARES Act. Eligibility for PUA claims was verified against quarterly earnings reports of W-2 wage earners provided by employers to the Commonwealth of Massachusetts.

9.  Along with the UI program, the DUA administered and managed the PUA program in Massachusetts. CARES Act program monies were received by the DUA into a People's United bank account in Connecticut from the United States Treasury. The monies paid to the claimants for these programs were transmitted via interstate wire communications from Connecticut to the claimant's designated bank account or the bank account for a Bank of America pre-paid debit card.

10.  To receive PUA benefits, Massachusetts claimants were required, as applicable, to (i) create an online account to submit the application (also known as PUA registration); (ii) provide

eligibility criteria; (iii) provide the reason(s) for unemployed status (*e.g.*, how COVID-19 affected employment); and (iv) certify that all the statements in the application were true, among other things. PUA claims submitted online to the DUA were processed via a server in Colorado.

11. To continue to receive weekly PUA or UI benefits, as applicable, claimants were required to submit weekly certifications online to the DUA that confirmed that the applicant (i) did not work during the weekly reporting period; and (ii) did not receive any income during the weekly reporting period. Weekly certifications submitted online to the DUA were also processed via a server in Colorado. It was material to the DUA that it received truthful, complete, and accurate information from applicants in the PUA registration, UI application, weekly certifications, and eligibility verification process, so that PUA and UI funds were disbursed to qualified and eligible recipients.

C. *The Paycheck Protection Program*

12. Another source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through the PPP. PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds toward payroll expenses.

13. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the

4

program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.

14.  In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its (a) average monthly payroll expenses, and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses. For sole proprietorships (self-employed individuals), this documentation included the applicant's (sole proprietorship's) IRS Form 1040 Schedule C, which showed the profit and loss for the business.

15.  A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

### Scheme to Defraud the DUA

16.  Beginning in or around May 2020, and continuing until at least in or around September 2021, in the District of Massachusetts and elsewhere, ORISCA devised a scheme to defraud, and to obtain PUA and UI benefits, by filing false and fraudulent applications, weekly certifications, and other documents with the DUA.

17.  The purpose of the scheme was for ORISCA to obtain PUA and UI payments under false and misleading pretenses, including false statements about his weekly income and weekly employment status.

5

*ORISCA Applies for PUA Benefits*

18.   On or about May 15, 2020, ORISCA caused an online application to be submitted for PUA benefits ("PUA Registration"). After certifying that his statements were truthful and accurate, and acknowledging that his statements were made under the penalty of perjury and that he could be subject to criminal prosecution, (i) ORISCA checked the box stating that he was unemployed, partially unemployed, or unable or unavailable to work because of the following COVID-19 reason: "I had to quit my job, was laid off, or had my hours reduced as a result of COVID-19" and (ii) ORISCA stated that the first date that he was accordingly impacted by COVID-19 was March 30, 2020.

19.   In his PUA Registration, ORISCA stated that he was able and available to work during the period from March 29, 2020 to May 9, 2020, but ORISCA denied earning in excess of $89 in any work week between March 29, 2020 and May 9, 2020:

> Did you have earnings in excess of $89.00 in any work week between 29-Mar-2020 and 09-May-2020?
> Yes   **No**

20.   Following the submission of his PUA Registration, ORISCA submitted weekly certifications ("Weekly Certifications") to the DUA for weeks ending May 16, 2020 and May 23, 2020, claiming that he did not work and did not receive any income during those weekly periods:

> **Earnings and Other Income**
> Did you work or telework between Sunday, May 10, 2020 and Saturday, May 16, 2020? This includes both full-time and part-time employment.
> Yes   No
> Did you receive any other income between Sunday, May 10, 2020 and Saturday, May 16, 2020? This includes holiday pay, sick pay, and vacation pay.
> Yes   No

6

**Earnings and Other Income**

Did you work or telework between Sunday, May 17, 2020 and Saturday, May 23, 2020? This includes both full-time and part-time employment.

| Yes | No |

Did you receive any other income between Sunday, May 17, 2020 and Saturday, May 23, 2020? This includes holiday pay, sick pay, and vacation pay.

| Yes | No |

21.  Based upon ORISCA's PUA Registration and ORISCA's Weekly Certifications for the weeks ending May 16, 2020 and May 23, 2020, ORISCA received the following PUA payments, which were sent via direct deposit payments to ORISCA's Bank of America account:

| Weekly Work Period | PUA Payment |
|---|---|
| April 4, 2020 | $1,027[1] |
| April 11, 2020 | $1,027 |
| April 18, 2020 | $1,027 |
| April 25, 2020 | $1,027 |
| May 2, 2020 | $1,027 |
| May 9, 2020 | $1,027 |
| May 16, 2020 | $1,027 |
| May 23, 2020 | $1,027 |
| **TOTAL** | **$8,216** |

22.  ORISCA knew that his PUA Registration and Weekly Certifications for the weeks ending May 16, 2020 and May 23, 2020 were false because ORISCA earned weekly salary from

---

[1] Eligible PUA applicants could apply for and receive PUA benefits retroactive to March 2020. In ORISCA's May 15, 2020 PUA Registration, ORISCA applied for and received PUA benefits for weekly periods dating back to the week ending April 4, 2020 up to the week ending May 9, 2020.

7

the Security Company well in excess of $89 per week for each of the weekly work periods ending April 4, 2020 to May 23, 2020.

23. On or about May 30, 2020, ORISCA submitted a Weekly Certification for the week ending May 30, 2020, but ORISCA's claim for PUA was rejected because ORISCA had also filed for UI unemployment benefits.

24. From in or about October 2020 to January 2021, ORISCA submitted 12 more Weekly Certifications to the DUA to receive PUA funds, but these claims were rejected because ORISCA was already collecting UI unemployment benefits.

*ORISCA Applies for UI Benefits*

25. On or about May 24, 2020, ORISCA submitted an application for UI benefits. In his UI application ("UI Application"), ORISCA claimed that his full-time employment with the Security Company was scheduled to end on or about May 31, 2020.

26. From approximately June 2020 to October 2020, ORISCA reported part-time work for the Security Company and, consequently, received UI benefits that corresponded to benefit amounts generally received by claimants that declared income from part-time employment.

27. From approximately December 2020 to September 2021, however, while ORISCA was working for, and receiving regular income as an employee of, the Delivery Company, ORISCA submitted dozens of false and fraudulent Weekly Certifications to the DUA in which ORISCA claimed to not have worked or received income.

28. For example, for the week ending September 4, 2021, ORISCA stated that he did not work during such period, nor did he receive any income during such work week:

8

| | | |
|---|---|---|
| Please review your responses for the **week of Sunday, 8/29/2021 through Saturday, 9/4/2021.** | | |
| **Initial Questions** | | |
| 1. | Did you work during the reporting period listed above? This includes full-time, part-time, temporary, self or military employment. | N |
| 2. | During the week listed above: | |
| | Were you offered employment? | N |
| | Quit a job? | |
| | Were you discharged from a job? | N |
| 3. | During the week listed above, did you receive or apply for income from any other sources that you have not previously reported to us? | N |

ORISCA certified to the DUA that the information he provided was true and correct:

**Acknowledgement**

☑ I certify that the information I have provided is true and correct. I know that Massachusetts Law provides penalties and or imprisonment for false statements to obtain benefits and that DUA actively pursues fraudulently collected benefits. I hereby acknowledge that DUA will verify my information to assure its accuracy.

    29.    ORISCA knew that his Weekly Certification for the week ending September 4, 2021 was false because he was working for, and receiving regular income from, the Delivery Company during such period, as reflected by ORISCA's Delivery Company pay records and personal bank records:



9

30. From approximately December 2020 to September 2021, ORISCA fraudulently collected at least approximately $26,484 in UI funds through intentionally submitting false Weekly Certifications to the DUA in which ORISCA claimed that he did not work or receive any income.

Scheme to Defraud the SBA

31. Beginning in or around March 2021, and continuing until at least in or around September 2021, in the District of Massachusetts and elsewhere, ORISCA devised a scheme to defraud, and to obtain PPP funds, by filing a false and fraudulent PPP loan application.

32. The purpose of the scheme was for ORISCA to obtain PPP loan proceeds under false and misleading pretenses, including false statements about his purported business's average monthly payroll, gross receipts, and expenses.

*ORISCA Applies for a PPP Loan*

33. In furtherance of the scheme, on or about March 20, 2021, ORISCA submitted a false and misleading PPP loan application to CrossRiver seeking approximately $20,000 in PPP loan funds (the "PPP Loan Application"). ORISCA caused the PPP Loan Application to be digitally signed and certified that the application and the information provided in all supporting documents and forms was true and accurate.

34. The PPP Loan Application falsely stated that average monthly payroll for ORISCA's business, listed as a local freight trucking business, was $8,000. In addition, ORISCA submitted with the PPP Loan Application what purported to be the Profit or Loss from Business for calendar year 2020 ("IRS Form Schedule C") for his alleged sole proprietorship. On the purported IRS Form Schedule C, ORISCA falsely claimed that his business had $115,347 in gross receipts and $15,981 in total expenses in 2020.

35. ORISCA knew that his PPP Loan Application was false because (i) ORISCA did not, in fact, file any IRS Form Schedule C for 2020 with the IRS; and (ii) ORISCA did not have $115,347 in gross receipts or $15,981 in total expenses from any sole proprietorship business during 2020.

36. On or about March 22, 2021, ORISCA's PPP Loan Application was approved and on or about March 23, 2021, CrossRiver's loan referral agent, Bluevine, issued a $20,000 payment to ORISCA's bank account at Bank of America via a wire transfer in interstate commerce. Following the deposit of the $20,000 in PPP loan proceeds, ORISCA issued $7,000 in wire payments to a family member, withdrew approximately $8,200 in cash, and paid thousands of dollars in personal bills, including over $800 in outstanding parking tickets.

37. On or about August 27, 2021, ORISCA submitted a PPP Loan Forgiveness Application ("PPP Loan Forgiveness Application") to CrossRiver. In the PPP Loan Forgiveness Application, ORISCA falsely claimed that the entire $20,000 PPP loan was spent on payroll costs for his business. ORISCA knew that this claim was false because he had wired $7,000 of the PPP loan funds to a family member and used the remainder of the PPP loan funds to make cash withdrawals, satisfy outstanding parking tickets, and pay for personal bills, including car insurance. On or about September 9, 2021, ORISCA's PPP Loan Forgiveness Application was approved.

## COUNTS ONE - FIVE
### Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343 and 2)

The Grand Jury charges:

38. The Grand Jury re-alleges and incorporates by reference paragraphs 1-37 of this Indictment.

39. On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

### CHRISTNEL ORISCA,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | May 15, 2020 | The PUA Registration caused to be electronically submitted by ORISCA, in Massachusetts, and routed interstate through servers outside of Massachusetts. |
| 2 | March 20, 2021 | The PPP Loan Application caused to be electronically submitted by ORISCA, in Massachusetts, and routed interstate through servers outside of Massachusetts. |
| 3 | March 22, 2021 | Wire transfer of $20,000 from Bluevine to ORISCA's account at Bank of America. |
| 4 | September 4, 2021 | The Weekly Certification for the Week Ending September 4, 2021 caused to be electronically submitted by ORISCA, in Massachusetts, and routed interstate through servers outside of Massachusetts. |
| 5 | September 8, 2021 | DUA wire transfer of $696 to ORISCA's account at Bank of America. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX
## False Statements to a Financial Institution; Aiding and Abetting
## (18 U.S.C. §§ 1014 and 2)

The Grand Jury further charges:

40. The Grand Jury re-alleges and incorporates by reference paragraphs 1-37 of this Indictment.

41. On or about March 20, 2021, in the District of Massachusetts and elsewhere, the defendant,

## CHRISTNEL ORISCA,

knowingly made and caused to be made a false statement and report for the purpose of influencing in any way the actions of Cross River Bank, an institution the accounts of which are insured by the Federal Deposit Insurance Corporation, upon any loan, as follows: in the PPP Loan Application, ORISCA falsely represented that ORISCA's business had average monthly payroll of $8,000, and in support of the loan application, ORISCA submitted a falsified IRS Form Schedule C.

All in violation of Title 18, United States Code, Sections 1014 and 2.

## WIRE FRAUD FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

42. Upon conviction of one or more of the offenses in violation of, Title 18, United States Code, Section 1343, set forth in Counts One through Five, the defendant,

### CHRISTNEL ORISCA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following assets:

    a. $54,700, to be entered in the form of a forfeiture money judgment.

43. If any of the property described in Paragraph 42, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 42 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## FALSE STATEMENT FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(2)(A))

The Grand Jury further finds:

44. Upon conviction of the offense in violation of Title 18, United States Code, Section 1014, set forth in Count Six, the defendant,

### CHRISTNEL ORISCA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offense. The property to be forfeited includes, but is not limited to, the following assets:

   a. $20,000, to be entered in the form of a forfeiture money judgment.

45. If any of the property described in Paragraph 44, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(2), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 44 above.

All pursuant to Title 18, United States Code, Section 982(a)(2).

A TRUE BILL

_____
FOREPERSON

_____
ADAM W. DEITCH
DUSTIN CHAO
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: DECEMBER 12 , 2024
Returned into the District Court by the Grand Jurors and filed.

/s/ Noreen A. Russo
_____
DEPUTY CLERK
at 4:14 PM

17